Filed 07/29/24

VERMONT SUPERIOR COURT

Chittenden Unit
175 Main Street, PO Box 187
Burlington VT 05402
802-863-3467
www.vermontjudiciary.org



CIVIL DIVISION

Case No. 23-CV-4453

---

**State of Vermont v. Meta Platforms, Inc. and Instagram, LLC**

---

## RULING ON MOTION TO DISMISS

Title:      Motion to Dismiss   (Motion: 3)
Filer:      Kendall Alison Hoechst
Filed Date:      January 19, 2024

The State brings this case against Meta (formerly Facebook) and its subsidiary Instagram, LLC, alleging violations of the Vermont Consumer Protection Act, 9 V.S.A. § 2451 et seq. The complaint alleges, inter alia, that Meta intentionally seeks to addict Instagram users under 18 ("Young Users") in a way that Meta knows is harmful to the users' physical and mental health, and misrepresents both its intentions and the harm it is knowingly causing. The State seeks injunctive relief, civil penalties, disgorgement of profits, investigative costs, and attorney's fees.

Meta and Instagram (jointly "Meta") argue that the case must be dismissed because (1) the State lacks personal jurisdiction over the company, (2) the claims are barred by the federal Communications Decency Act, (3) the claims are barred by the First Amendment, and (4) the allegations fail to state a valid claim under the Vermont Consumer Protection Act. The court heard oral argument on the motion to dismiss on July 3.

The State alleges many facts in its 378-paragraph complaint. A few are summarized here for purposes of the discussion below. The court makes no finding as to their accuracy at the pleading stage.

Defendant Meta Platforms, Inc. is a social media company that derives 98% of its total revenue from advertising. Meta owns, operates, and controls Defendant Instagram, LLC, one of the most widely used social media platforms globally and in Vermont. Instagram's mobile application and website lets consumers—including Vermont consumers—create profiles from which they can post pictures and videos with captions, follow other Instagram users' profiles and posts, "like" and "comment" on other users' posts, "share" content that other users have posted, and communicate with other users privately through direct messaging. Meta collects data from Instagram users to algorithmically curate and personalize each user's experience, including the content displayed and recommendations on which other accounts to follow. It is estimated that 22 million teens—including approximately 62% of teens ages 13–17—log onto Instagram in the U.S. each day.

Meta profits by leveraging user data to sell advertising. Thus, its business model incentivizes it to maximize the amount of time that young users spend on Instagram, and that has been a priority for Meta throughout its corporate history. The State alleges that, despite Meta's knowledge of the harms to teens under eighteen ("Young Users") caused by excessive and compulsive Instagram use, Meta designed Instagram to be addictive to them through specific features and algorithms. Moreover, the State alleges that Meta has misled consumers about Instagram's design, concealed its internal

findings about the degree to which Instagram intentionally causes Young Users to use the platform compulsively and excessively, and misled consumers about the degree to which it exposes Young Users to harmful content and experiences. The State contends that Meta's conduct constitutes unfair and deceptive acts and practices under the Vermont Consumer Protection Act.

With respect to Vermont in particular, the complaint alleges that as of June 2021, over 40,000 Vermont teens used Instagram each month and almost 30,000 used it daily; at times more teens in Vermont used Instagram, per capita, than in any other state; Meta has focused research on Vermont teens and on Vermont as one of four targeted states; Meta has "sold advertising to both national businesses and Vermont businesses targeting Vermont markets;" Meta has "sought to refine Instagram in order to increase the engagement of Vermont teens, in particular;" has entered into at least tens of thousands of contracts with Vermonters including Young Users; and has used personal data from those users to target advertising to them from, inter alia, Vermont businesses. Complaint ¶¶ 15, 75, 76, 79-81, 84, 85.

<u>Discussion</u>

The question on a motion such as this is whether "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." <u>Skaskiw v. Vermont Agency of Agric.</u>, 2014 VT 133, ¶ 6, 198 Vt. 187 (citation omitted). A court must "assume as true all facts as pleaded in the complaint, accept as true all reasonable inferences that may be derived from the plaintiff's pleadings, and assume as false all contravening assertions in the defendant's pleadings." <u>Id</u>. The question is "whether the bare allegations of the complaint are sufficient to state a claim." <u>Id</u>. "[T]he threshold a

plaintiff must cross in order to meet our notice-pleading standard is exceedingly low." Bock v. Gold, 2008 VT 81, ¶ 4, 184 Vt. 575 (quotation and citations omitted). Such motions "are disfavored and should be rarely granted." Id.

## Personal Jurisdiction

Personal jurisdiction addresses whether a party can be sued in a particular state. It has two categories: "general" jurisdiction and "specific" jurisdiction. The former generally exists when the state is the defendant's home or primary place of business. As Meta is based in California, the parties agree that the issue here is specific jurisdiction.

A nonresident defendant is subject to specific jurisdiction when a defendant has "purposefully directed . . . activities at residents of the forum and the litigation results from alleged injuries that arise out of or relate to those activities." Fox v. Fox, 2014 VT 100, ¶ 27, 197 Vt. 466 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985)). It must be foreseeable "that the defendant's conduct and connection with the forum State are such that [it] should reasonably anticipate being haled into court there." Id. ¶ 29 (quoting Burger King, 471 U.S. at 474). "A corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State may be sued in that state when those products subsequently injure consumers; a publisher who distributes magazines in a distant State may fairly be held accountable in that forum for damages resulting there from an allegedly defamatory story, and parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to the other state's jurisdiction in connection with the consequences of their activities." Id. ¶ 28 (quotations omitted). "'Once it has been decided that a defendant purposefully

established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice.'" State v. Atl. Richfield Co., 2016 VT 22, ¶ 27, 201 Vt. 342 (quoting Burger King, 471 U.S. at 476).

The impact upon Vermonters is not sufficient to support jurisdiction: the question turns on Meta's actions. "The contacts must be the defendant's own choice and not random, isolated, or fortuitous," and they "must show that the defendant deliberately reached out beyond its home—by, for example, exploi[ting] a market in the forum State or entering a contractual relationship centered there." Ford Motor Co. v. Montana Eighth Jud. Dist. Ct., 592 U.S. 351, 359 (2021) (citation and quotations omitted) (brackets in original).

The law regarding specific jurisdiction developed long before the internet, interactive websites, and apps existed. How the doctrine applies to the on-line world is an evolving area of law. *See, e.g.*, Douglas Co., Inc. v. My Brittany's LLC, No. 19-CV-1234-SM, 2020 WL 2768973, at *6 (D.N.H. May 28, 2020) ("This area of the law is both evolving and decidedly unsettled."); McCleese v. WM. A. Natorp Co., No. 5:19-CV-34, 2019 WL 13396473, at *4 (D. Vt. Oct. 24, 2019)("The Supreme Court has not yet directly addressed how traditional personal jurisdiction doctrine is affected by the internet."); Dist. of Columbia v. Facebook, Inc., No. 2018 CA 8715 B, 2019 WL 7212642, at *8 (D.C. Super. May 31, 2019) ("The relationship between a defendant's online activity and its susceptibility to suit in a foreign jurisdiction remains ill-defined, and the United States Supreme Court has yet to offer guidance in this particular area."). It is clear that merely having a passive website that is accessible to all does not create jurisdiction in every

state. TheHuffingtonPost.com, Inc., 21 F.4th at 320 ("Grannies with cooking blogs do not, and should not, expect lawsuits from Maui to Maine."). Vermont residents' mere use of an app that is accessible to all cannot create jurisdiction here. The question is how much more is needed to subject an internet-based entity to jurisdiction in a particular state. Has Meta itself done enough to invite jurisdiction in Vermont?

The State relies initially upon a sliding scale test created over twenty years ago in Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997). That case essentially held that the more interactive the activity, the greater the likelihood of personal jurisdiction. However, more recent cases have pointed out that such an analysis is out of pace with the changes in internet-based businesses over recent decades, and would sweep huge numbers of companies into its reach. *See, e.g.*, My Brittany's LLC, 2020 WL 2768973, at *6. Nor was Zippo ever a controlling test.

Both sides point to multiple, more recent cases supporting their positions. Meta, for example, cites Fidrych v. Marriott Int'l, Inc., 952 F. 3d 124, 143 (4th Cir. 2020). There, the court found that because Marriott's reservation website was "accessible to all but targeted at no one in particular" it did not support personal jurisdiction in South Carolina. Meta also cites cases holding that merely posting ads for local businesses, or having local residents buy products through such ads, is not a basis for jurisdiction. Johnson v. TheHuffingtonPost.Com, 21 F.4th 314, 320 (5th Cir. 2021); Doshier v. Twitter, 417 F. Supp. 3d 1171, 1177-78 (E.D. Ark. 2019). The State cites, for example, an Arkansas case that found allegations that "Meta's features and targeted activities toward young Arkansans have significantly injured them by causing various harms and psychological injuries as well as addiction to the platform" were sufficient to support

personal jurisdiction. <u>Arkansas ex. Rel Griffin v. Meta Platforms, Inc.</u>, No. 57CV-23-47 (Ark. 18th Cir. Ct. June 13, 2024). It also points to <u>District of Columbia v. Facebook, Inc.</u>, *supra,* at 10, which found that "Facebook's distribution of District of Columbia users' personal data for profit . . . qualifies as systematic and continuous 'transactions' between Facebook and its consumers in the District of Columbia." The case law creates no clear test for when a company's on-line presence is sufficient to create jurisdiction in a particular state. The crux of the question is whether the complaint adequately alleges that Meta's own actions have such a connection to Vermont that the company "should [have] reasonably anticipate[d] being haled into court" here. <u>Fox</u>, 2014 VT 100, ¶ 29 (quotation omitted).

The State argues that Meta's acts were specifically directed towards Young Users in Vermont. Specifically, the State alleges that Meta has entered into contracts with many thousands of Vermonters (Complaint ¶¶ 50-52, 85), uses the data it collects from these thousands of Vermont users to sell advertising to Vermont businesses, including at least five specifically named in the complaint (<u>id</u>. ¶¶ 84–85 & nn. 38–39), and has specifically tracked and studied Young Users in Vermont as part of its attempt to increase their addiction to Instagram (<u>id</u>. ¶¶ 74–77, 79–81, 85, 89–111). The State also alleges that Meta has designed Instagram to target Young Users and to increase the amount of time they spend on the app (<u>id</u>. ¶¶ 119–20), and that it has misled the public about the addictiveness of the app and the mental health impacts of such addiction (<u>id</u>. ¶¶ 258–61). These last allegations, however, apply to Young Users everywhere, not just in Vermont.

The court concludes that the allegations here are sufficient to establish a prima facie case for jurisdiction. Meta has done more than merely make its product available to the world at large on the internet. Unlike, for example, the Marriott case, Meta does not merely have a dropdown menu listing every state. Nor does it merely host ads for Vermont businesses. Nor is this a case of a company contracting with or selling a product to only a handful of customers in the state. Instead, as noted above, the State alleges that Meta has entered into contracts with tens of thousands of Vermonters, collected personal data from them to target advertising to them, adapted the content it provided them based upon that data, and sold the data about Vermonters to Vermont businesses to target Vermont users. Furthermore, the State alleges that Meta has specifically tracked and studied Young Users in Vermont as part of its attempt to increase their addiction to Instagram. Assuming such facts can be proved, they show direct targeting of Vermonters by Meta. This is not merely fortuitous, attenuated, or random contact.[1]

Meta argues that none of its contacts with Vermont are causally connected to the conduct at issue here: the alleged intentionally harmful design of Instagram, and the alleged misrepresentations and omissions. However, the State need not show a direct line of causation between Meta's acts of reaching into Vermont and the alleged injuries. "None of our precedents has suggested that only a strict causal relationship between the defendant's in-state activity and the litigation will do." Ford Motor Co., 592 U.S. at 362. There must only be a connection between the two. The States's allegations are that the

---

[1] Meta also argues that there is no evidence that its actions in Vermont are different from its actions in every other jurisdiction. Reply at 5 ("The State does not allege any of this conduct was unique to Vermont."). Whether this matters is a question the court need not answer today: at this stage of the case the court has no evidence on which to determine the accuracy of such a claim.

harm to Young Users in Vermont is the result of Meta's research about and targeting of those users, and their resulting exposure to its harmfully designed algorithms. This is sufficient to establish a connection.

The court must next consider whether it is nonetheless unfair to require Meta to defend itself here. *See* Atl. Richfield, 2016 VT 22, ¶ 27. The relevant factors include "the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies." Burger King, 471 U.S. at 477. "[W]here a defendant who purposefully has directed [its] activities at forum residents seeks to defeat jurisdiction, [it] must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." Id.

All that Meta points to in this regard is that there is already a multi-district suit in California, and there are no allegations in the complaint that witnesses or documents are here. No actual burden is cited, and given the allegations that it is a $116 billion company, *see* Compl. ¶ 72, the court cannot imagine that hiring Vermont lawyers and coming to Vermont for trial will be more than a drop in Meta's waters. Meta argues that Instagram is "available globally and thus the State's allegations could be made as to any state in the country." Motion at 8. That may be, but there is no rule that a company cannot be subject to suit in multiple jurisdictions. The court finds sufficient allegations to support personal jurisdiction.

## The Communications Decency Act

Meta next argues that Section 230 of the federal Communications Decency Act bars the claims here. 47 U.S.C. § 230(c)(1). That provision states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." For example, Meta is not considered the publisher of a social media influencer's posts. Meta thus argues that it is insulated from liability for any harm caused to Young Users by what is shown to them on Instagram.

"Section 230 bars liability only if the cause of action seeks to impose liability for the provider's *publication* decisions regarding third party content—for example, whether or not to publish and whether or not to depublish." Social Media Cases, No. 22STCV21355, 2023 WL 6847378, at *11 (Cal. Super. Ct. Oct. 13, 2023). Thus, Meta may well be insulated from liability for injuries resulting from bullying or sexually inappropriate posts by Instagram users, but the State at oral argument made clear that it asserts no claims on those grounds. The question is whether it is insulated from liability for the claims that its own design independently harms Young Users. The State alleges that the intentional *addictiveness* itself harms Young Users' mental health, separate and apart from the *content* of what they see. Compl. ¶ 187-200. Likewise, the State alleges that Meta failed to warn users (and parents) of the harm that their product can cause merely from overuse, separate and apart from the content. Id. ¶¶ 312-315. Unsurprisingly, both sides cite cases supporting their arguments.

The cases cited by Meta in its initial motion are not persuasive. Those cases involve claims that the *substance* of third-party content posted on the platform harmed

Ruling on Motion to Dismiss
State of Vermont v. Meta Platforms, Inc. et al, 23-CV-4453
Page **10** of **18**

the plaintiffs. *See*, *e.g.*, Force v. Facebook, Inc., 934 F.3d 53, 65 (2d Cir. 2019) (plaintiffs sought to hold Facebook liable for giving Hamas a forum with which to communicate, for bringing Hamas's message to interested parties, and for failing to delete content from Hamas members' Facebook pages); Klayman v. Zuckerberg, 753 F.3d 1354, 1355–56 (D.C. Cir. 2014) (plaintiff sued Facebook for failing to promptly remove pages from its platform); Johnson v. Arden, 614 F.3d 785, 787, 791 (8th Cir. 2010) (involving claims that "allegedly defamatory statements posted on an internet discussion board" by third parties harmed plaintiffs); Barnes v. Yahoo!, Inc., 570 F.3d 1096, 1102–03 (9th Cir. 2009), as amended (Sept. 28, 2009) (alleging that internet service provider should have removed certain content from its website); Dyroff v. Ultimate Software Grp., Inc., 934 F.3d 1093, 1097–98 (9th Cir. 2019) (alleging that website operator—through its algorithms and recommendations—was liable for plaintiff's son's heroin death resulting from drugs he obtained from interacting with third party drug dealer on website); Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 257 (4th Cir. 2009) (alleging that consumer affairs website was liable for allegedly defamatory statements posted on website by third parties). Section 230 plainly barred the claims in all of those cases. In its subsequent filings, Meta cites several other cases holding that algorithms that determine what content to show, or when, or how much, constitute publishing. However, with one exception, those cases also addressed injuries caused by the third-party content, not by the internet companies' own designs. The exception is In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., No. 4:22-MD-03047-YGR, 2023 WL 7524912 (N.D. Cal. Nov. 14, 2023). In that case, the claims were very similar to those here: that the algorithms and other features created by the defendants caused children harmful addiction to the media and resulting mental heath problems.

The problem with such an analysis is that it ignores the language of the statute, which bars treating a company such as Meta as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). In other words, Meta cannot be held liable for the things said by someone else on Instagram. That is not what is alleged here. The State is not seeking to hold Meta liable for any content provided by another entity. Instead, it seeks to hold the company liable for intentionally leading Young Users to spend too much time on-line. Whether they are watching porn or puppies, the claim is that they are harmed by the time spent, not by what they are seeing. The State's claims do not turn on content, and thus are not barred by Section 230. *Accord*, Lemmon v. Snap, Inc., 995 F. 3d 1085, 1092-94 (9th Cir. 2021) (no immunity under Section 230 because negligence claim for harmful design "does not seek to hold Snap liable for its conduct as a publisher or speaker"); Tennessee v. Meta Platforms, Inc., No. 23-1364-IV at 20-21 (Tenn. Chancery Ct., March 13, 2024) (Section 230 does not apply to claims that Meta misrepresented features they knew were harmful to Young Users); Social Media Cases, 2023 WL 6847378, at *31-32 (Where "[t]he features themselves allegedly operate to addict and harm minor users of the platforms regardless of the particular third-party content viewed by the minor user," Section 230 does not apply).

The State's deception claim (Compl. ¶¶ 258–61) is also not barred by Section 230 for the same reason—it does not depend on third party content or traditional editorial functions. The State alleges that Meta has failed to disclose to consumers its own internal research and findings about Instagram's harms to youth, including "compulsive and excessive platform use." Compl. ¶ 259. The alleged failure to warn is not

Ruling on Motion to Dismiss
State of Vermont v. Meta Platforms, Inc. et al, 23-CV-4453
Page **12** of **18**

"inextricably linked to [Meta's] alleged failure to edit, monitor, or remove [] offensive content." Herrick v. Grindr LLC, 765 F. App'x 586, 591 (2d Cir. 2019); *see also* Doe v. Internet Brands, Inc., 824 F.3d 846, 851 (9th Cir. 2016) ("A . . . warning that [defendant] generated would involve only content that [defendant] itself produced. Therefore, an alleged tort based on a duty that would require such a self-produced warning falls outside of section 230(c)(1)."); In re Soc. Media Adolescent Addiction/Pers. Inj. Prod. Liab. Litig., 2023 WL 7524912, at *16 ("The duty arises not from their publication of conduct, but from their knowledge, based on public studies or internal research, of the ways that their products harm children. Plaintiffs allege through these claims that defendants could meet this duty without making any changes to how they publish content, by providing warnings for any and all of the alleged defects."); Social Media Cases, 2023 WL 6847378, at *46 ("Meta could have fulfilled its duty to warn of these potential harms without referencing or deleting any content—the duty springs from its capacity as a creator of features designed to maximize engagement for minors, not from its role as publisher.").

## The First Amendment

The next argument is that Meta's exercise of editorial control over what is posted on Instagram is protected under the First Amendment. Motion at 22. Again, however, this fails to distinguish between Meta's role as an editor of content and its alleged role as a manipulator of Young Users' ability to stop using the product. The First Amendment does not apply to the latter. "[A] restriction on nonspeech or non-expressive conduct does not implicate the First Amendment and receives only rational basis scrutiny." Ruling on Mot. to Dismiss, State v. Clearview AI Inc., No. 226-3-20

Cncv, slip copy at 10–11 (Vt. Super. Ct. Sept. 10, 2020) (Ex. A to Pl.'s Opp'n) (citing Arcara v. Cloud Books, Inc., 478 U.S. 697, 706–07 (1986); Sorrell v. IMS Health Inc., 564 U.S. 552, 567 (2011)); *see also* Elane Photography, LLC v. Willock, 284 P.3d 428, 439 (N.M. App. Ct. 2012) ("the First Amendment does not apply when a law regulates conduct rather than expression"). Meta pointed at oral argument to the Supreme Court's recent ruling in Moody v. NetChoice, LLC, __U.S. __, 144 S. Ct. 2383 (2024), which involved the application of the First Amendment to social media companies. Meta points to the comment there that "expressive activity includes presenting a curated compilation of speech originally created by others." Id. at 2400. As Meta acknowledged, that was merely dicta, but this court nonetheless takes no issue with the point. It does not change the result here. Unlike Moody, where the issue was government restrictions on content, as discussed above it is not the substance of the speech that is at issue here.

There is a separate claim here that Meta's alleged lies in testimony before Congress constitute actionable misrepresentations under the Consumer Protection Act. Meta argues that these are protected by the First Amendment right to petition the government. Meta cites several cases for the proposition that even false testimony to Congress is so protected. The first case cited does not so hold. It discusses venal motives, "sham" petitions (attempts to hurt a competitor), and conspiracies with the government, but not falsehoods. Video Int'l Prod., Inc. v. Warner-Amex Cable Commc'ns, Inc., 858 F.2d 1075 (5th Cir. 1988). The others all address the question of antitrust suits and "sham" petitions. Mark Aero, Inc. v. Trans World Airlines, Inc., 580 F.2d 288 (8th Cir. 1978); Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir. 1999); Kottle v. Nw. Kidney Centers, 146 F.3d 1056 (9th Cir. 1998). None address

whether a consumer protection claim may be brought based upon false testimony before a government body. Moreover, it is a crime to knowingly lie under oath to Congress. 18 U.S.C. §§ 1001, 1621; U.S. v. Norris, 300 U.S. 564 (1937); United States v. Lattimore, 215 F.2d 847, 867–68 (D.C. Cir. 1954) ("Congress, the courts, and administrative bodies must not be misled, in their official action, by false testimony.") (Edgerton, J., concurring). The court is thus unpersuaded by Meta's claim that such lying is protected speech, and cannot say that "it is beyond doubt that there exist no facts or circumstances that would entitle the plaintiff to relief." Skaskiw, 2014 VT 133, ¶ 6. Dismissal on this basis is therefore inappropriate.

## The Consumer Protection Act

Meta's next argument is that the Vermont Consumer Protection Act does not apply here for various reasons. First, it argues that because Instagram is free, there is no seller, buyer, or commerce at issue.

Instagram is certainly engaging in commerce when it provides Instagram to Vermonters: "To be considered 'in commerce,' the transaction must take place in the context of [an] ongoing business in which the defendant holds himself out to the public." Foti Fuels, Inc. v. Kurrle Corp., 2013 VT 111, ¶ 21, 195 Vt. 524 (quotations and citation omitted). That is exactly what Meta does. Users of Instagram allegedly sign a contract agreeing to give Instagram access to personal information for advertising purposes in exchange for using the site. That sufficiently pleads a contractual business relationship between Instagram and each user. As Meta itself notes, the definition of consumer includes a person who "contracts" for goods or services. 9 V.S.A. § 2451a(1).

Meta's argument that there must be money changing hands is unsupported. Although the statute is not a model of clarity, it has different requirements for cases brought by individuals and those brought by the State. The State may bring actions when it has reason to believe that a defendant "is using or is about to use any method, act, or practice" that is an unfair or deceptive act in commerce. 9 V.S.A. §§ 2458, 2453. There is no requirement of a specific purchase and sale in such cases. In fact, such cases can be brought before any act has even taken place. Id. § 2458 (action may be filed when Attorney General believes an unfair act "is about to" occur). Moreover, "proper defendant[s] includ[e] not only a seller or solicitor, but also an 'other violator,' a broad term . . ." Elkins v. Microsoft Corp., 174 Vt. 328, 331 (2002) (allowing claim against product manufacturer despite there being no direct transaction between the consumer and the manufacturer). The State has sufficiently alleged acts covered by the statute.

Nor is the court persuaded by Meta's next argument: that the complaint fails to allege any actionable omissions or misrepresentations. Motion at 28-32. Meta argues that representations as to the safety of the site are mere statements of opinion, not fact, and cannot be the basis of a misrepresentation claim. *See* Webb v. Leclair, 2007 VT 65, ¶ 22, 182 Vt. 559; Heath v. Palmer, 2006 VT 125, ¶ 14, 181 Vt. 545; Winey v. William E. Dailey, Inc., 161 Vt. 129, 133 (1993). A general statement that "Instagram is safe" might well be opinion. However, the complaint has specific allegations that, for example, Meta falsely denied that it designed Instagram to get users to spend more time on the site, and falsely denied that it had any research to show the site is addictive. Complaint ¶¶ 306-312. Those are factual statements that can be proved or disproved, not opinion or puffery.

Next, Meta asserts that there are insufficient details as to what misrepresentations were made, when, and to whom. The complaint, however, identifies specific Congressional testimony, quarterly reports to the public, press releases, and intentional omissions of internal research and findings of harms posed by specific Instagram features. Id. ¶¶ 266-285; 292-302, 306-310, 328-336.

Meta also argues that there are no allegations to support a finding of materiality as to any misrepresentation or omissions. Specifically, Meta notes that the complaint does not say that any user would have chosen not to use Instagram had she known of all the falsehoods or omitted information. Motion at 33. To the contrary, the complaint alleges both that (1) "[i]f Meta publicly disclosed the known risks and harms of Instagram to youth, many consumers—including young users and their parents and guardians—would likely reject the product," and (2) the misrepresentations and omissions "were likely to have affected, and are likely to be affecting, consumers' decisions to use Instagram." Id. ¶¶ 28, 371. While general, these are sufficient allegations to survive a motion to dismiss.

Finally, Meta argues that the complaint lacks any allegations of unfair conduct, defined for purposes of the Consumer Protection Act as "'likely to cause substantial injury to consumers.'" See Fed. Trade Comm'n v. LeadClick Media, LLC, 838 F.3d 158, 168 (2d Cir. 2016) (quoting 15 U.S.C. § 45(n)); 9 V.S.A. § 2453(b); Christie v. Dalmig, 136 Vt. 597, 601 ("9 V.S.A. s 2453(b) mandates that the courts of this state be guided by the construction of similar terms contained in the Federal Trade Commission Act."). The parties dispute whether this is a required element of the State's case, but the court concludes that it is nonetheless adequately pled. The complaint alleges that Instagram

has purposely been designed to affect Young Users, despite Meta knowing that such addiction causes a litany of physical and mental health problems for such users, including anxiety, depression, lack of sleep, suicidal thoughts and behaviors, and changes in brain structure. It is hard to see how such results, if proved, could *not* be considered substantial injury. The fact that most consumer protection cases involve financial injury does not preclude a finding of substantial injury based upon physical and mental harm. As another court has noted in interpreting the Federal Trade Commission Act, "although Congress has noted that consumer injury often involves monetary harm, and that mere '[e]motional impact and other more subjective types of harm' are ordinarily insufficient, these generalizations do not limit Section 5(n)'s reach only to tangible harms." Fed. Trade Comm'n v. Kochava Inc., 671 F. Supp. 3d 1161, 1174 (D. Idaho 2023) (quoting S. Rep. No. 103-130, at 13, 1993 WL 322671 (1993)); *see also* F.T.C. v. Accusearch, Inc., No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007), aff'd, 570 F.3d 1187 (10th Cir. 2009) ("while the substantial injury requirement may not *ordinarily* be met from emotional impact harm that is 'trivial or merely speculative,' the evidence presented to the Court regarding the sale of consumer phone records in particular demonstrates a host of emotional harms that are substantial and real and cannot fairly be classified as either trivial or speculative.").

Order

The motion to dismiss is denied. Meta shall file its answer within 14 days, and the parties shall file a stipulated discovery schedule within 30 days thereafter.

Electronically signed on July 28, 2024 pursuant to V.R.E.F. 9(d).

_____
Helen M. Toor
Superior Court Judge